UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
EXPERIENCE HENDRIX, LLC,

                Plaintiff,

        -against-                              06 Civ. 9926 (LAK)


EDWARD CHALPIN, PPX ENTERPRISES, INC., PPX
INTERNATIONAL, INC., et al.,

                Defendants,

        -and-

OCEAN TOMO, LLC., and OCEAN TOMO AUCTIONS LLC,

                Intervenors.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**


        Appearances:


                Peter S. Shukat
                Dorothy M. Weber
                SHUKAT ARROW HAFER & WEBER, L.L.P.
                *Attorneys for Plaintiff*

                Lowell B. Davis
                *Attorney for Defendants*

                Monica Petraglia McCabe
                DLA PIPER U.S. L.L.P.
                *Attorneys for Intervenors*


LEWIS A. KAPLAN, *District Judge.*

2

After his untimely death in 1970, the widely hailed musician and songwriter Jimi Hendrix left a body of musical works and a world of controversy. This action involves the first and is part of the second. The matter is before the Court on plaintiff's motion for a preliminary injunction and an order of attachment.

*Facts*

A.    *Background*

*The Hendrix-Chalpin Agreement*

Plaintiff claims, and defendants do not dispute, that Hendrix, in or about 1965, signed a one-page recording agreement with PPX Enterprises, Inc. ("Enterprises"), an entity controlled by Edward Chalpin.[1] Hendrix there agreed to "produce and play and/or sing exclusively for Enterprises" for a period of three years and that Enterprises would have exclusive rights to the masters so produced, all in exchange for a royalty of one percent of the retail selling price of the records so produced.[2] This agreement led to lengthy legal battles between Chalpin and Enterprises, on the one hand, and Hendrix and his estate (the "Hendrix Estate"), on the other.

*The English Litigation*

The Hendrix-Chalpin controversy appeared to have been resolved in 1973 by way of a consent decree in an action entitled *PPX Enterprises, Inc. v. Davis* in the High Court of Justice in

---

[1]    *See* Tr., Oct. 31, 2006 ("Hearing Tr.") 10-13.

[2]    Wasson Decl. ¶ 11 & Ex. A.

London. In brief, the Hendrix Estate there acknowledged Enterprises' ownership of 33 master recordings and the rights therein subject to an increased royalty in favor of the Estate. Enterprises dropped all claims against the defendants and agreed to surrender other master recordings then in its possession. Judgment was entered in favor of the defendants and against Enterprises in the amount of £50,000, and Chalpin personally guaranteed payment of that sum.[3]

In 2001, plaintiff, having succeeded to the interests of the Hendrix Estate, sued Enterprises and Chalpin in the United Kingdom to enforce the terms of the consent decree and for damages. That action resulted in a judgment in favor of plaintiff in August 2003 for, among other things, £304,137, exclusive of interest.[4]

*Domestication of the English Judgment*

On October 6, 2003, plaintiff commenced an action against Chalpin and Enterprises on the English judgment in the New York Supreme Court, New York County. The defendants appeared in the action, and plaintiff obtained a judgment in the amount of $725,868.53 plus interest, attorneys fees, costs and expenses.[5] The total amount of that judgment now exceeds $919,000.[6] Plaintiff has been unsuccessful in collecting any of it.

---

[3] *See* Am. Cpt. Ex. A.

[4] Wasson Decl. ¶¶ 16-17. *See also* Am. Cpt. Ex. B.

[5] Wasson Decl. ¶¶ 18-20.

[6] *Id.* n.2.

4

*The Auction Announcement*

In late September, plaintiff learned that Intervenors were advertising an October 25-26 auction of various Hendrix properties. Three of the lots on offer were as follows:

•        <u>Lot 62</u>              Rights relating to an unreleased album called *Public Enemy.*

•        <u>Lot 64</u>              The 33 Hendrix masters referred to above.

•        <u>Lot 65</u>              What purports to be the "entire Jimi Hendrix Catalog."

According to the auction catalog, the sellers of these lots are PPX International, Inc. ("International") (Lots 62 and 64) and the Estate of Michael Frank Jeffrey (Lot 65). Chalpin, it should be noted, is the administrator of the Jeffrey Estate and has a significant financial interest in the transaction.[7]


B.      *This Action*

Plaintiff commenced this action on October 18, 2006. The complaint, as amended, alleges that Enterprises fraudulently conveyed Lots 62 and 64 to International without consideration.[8] It claims also that Chalpin is engaged in self-dealing with respect to Lot 65. Overall, the gravamen of the thirteen-count complaint is that the alleged transfers of Lots 62 and 64 to International were fraudulent as to plaintiff, a judgment creditor of Chalpin and Enterprises.[9]

---

[7]         Wasson Decl. ¶¶ 24(ii), 31-32.

[8]         Am. Cpt. ¶¶ 27, 32.

[9]         Counts I and II in substance allege breach of the contract inherent in the English consent decree in that Chalpin and Enterprises have failed to pay royalties and seek an accounting. Counts III, IV, and V seek an injunction restraining, among other things, further transfers. Counts VI, VII, VIII, and IX assert that the transfer of Lot 64 was fraudulent in violation

C.      *The Motion*

On October 23, 2006, plaintiff presented on order to show cause seeking a temporary restraining order, a preliminary injunction, and an order of attachment. After hearing counsel for all parties, the Court temporarily restrained defendants "from transferring, selling, or otherwise alienating, and from encumbering, any assets or property in their possession, custody or control except upon further order of the Court." While the restraining order was very broad, the Court expressed the expectation, based on representations of counsel, that the parties would promptly work out a mutually acceptable, narrower form of order. The Court set the motion for an order of attachment for a hearing on October 26, 2006 and that for a preliminary injunction for October 31, 2006.[10] In addition, it granted plaintiff's application for expedited discovery.[11]

For whatever reason, the parties did not work out a narrower form of restraining order. Ocean Tomo, LLC, and Ocean Tomo Auctions LLC (collectively "Ocean Tomo" or the "Auctioneer") became concerned about their ability to conduct the auction. On October 25, 2006, the Court granted their application to intervene for the limited purpose of seeking modification of the restraining order to permit the auction to go forward. It directed Ocean Tomo to pay into the Registry of the Court all proceeds of the sale of lots 62, 64, and 65, up to the sum of $941,711.26, to be held for plaintiff and defendants, as their interests subsequently might appear. It further

---

of several provisions of the New York Debtor and Creditor Law. Counts X, XI, and XII assert claims for unjust enrichment, restitution, and conversion. Count XIII seeks to pierce the corporate veils of Enterprises and International to reach Chalplin.

[10]

*See* Tr. Oct. 23, 2006, at 26-28.

[11]

*Id.* at 26

ordered, with plaintiff's consent, that upon such payment the restraining order would be dissolved and the motions for an order of attachment and a preliminary injunction would be withdrawn.

The motion for an order of attachment was scheduled to be heard on October 26, 2006. None of the parties appeared. The only paper submitted on behalf of defendants was a declaration of counsel attaching, among other things, what purports to be an unsigned bill of sale, dated July 19, 1972, which recites that Enterprises sold a variety of assets, including "the Master Recordings," a term not further defined, to International for "the sum of One Dollar and other good and valuable consideration."[12] The declaration, however, does not claim that the declarant has personal knowledge of anything, does not state that the purported bill of sale ever was signed, and does not authenticate it in any satisfactory manner.

In the meantime, plaintiff sought to engage in expedited discovery pursuant to the Court's order, serving various document requests on defendants. Defendants did not comply.

D.    *The Auction*

The auction evidently was held as scheduled on October 26. There were no bidders for Lots 62 and 64. A bid of $15 million allegedly was made for Lot 65 by an as-yet unnamed bidder and the lot knocked down to that bidder. The Auctioneer, however, claims that the bid was subject to an agreement that gives the bidder five days from the auction to make a deposit on the lot as well as the right to withdraw from the purchase at any time up to and including October 26, 2007. Should

---

[12]    Davis Decl. Ex. B.

the bidder withdraw, it allegedly is entitled to the return of its deposit.[13] In consequence, nothing has been paid into the Registry of the Court.

E.      *The Hearing*

The Court held an evidentiary hearing on the motion for a preliminary injunction on October 31, 2006. The only witness called by either party was Edward Chalpin. His position, generally speaking, was that Enterprises sold the 33 Hendrix masters to International for good and sufficient consideration. His testimony as to the date and circumstances of the alleged sale, the nature and value of any consideration, the circumstances of the alleged sale, and a great many other matters was vague, punctuated by protestations of lack of memory, and internally inconsistent. In short, the Court does not credit any of his testimony except to the extent specifically relied upon here. Moreover, the Court is persuaded, subject of course to reconsideration at later stages of this litigation, that Chalpin's testimony evaded disclosure of the facts.

*Discussion*

A.      *Preliminary Injunction*

In order to obtain a preliminary injunction, plaintiff must show a threat of irreparable injury and either a likelihood of success on the merits or the existence of questions that provide fair ground for litigation and a balance of hardships tipping decidedly in its favor.[14]

_____

[13]
      *See* Hearing Tr. 55-56.

[14]
      *E.g.*, *Louis Vuitton Malletier v. Dooney & Burke, Inc.*, 454 F.3d 108, 113-14 (2d Cir. 2006).

8

### 1.   *Irreparable Injury*

In this case, the threat of irreparable injury is palpable. Plaintiff's English judgment dates back to 1973 and its New York judgment to 2003. Its efforts to collect have been frustrated at every turn.[15] The valuable Hendrix masters that were owned by Enterprises, one of the judgment debtors, in the early 1970's now are said by defendants to belong to its sister company, International, which is not a judgment debtor. The timing and circumstances of the alleged transfer, obviously facts well known to the defendants, remain unexplained by documentary evidence or credible testimony. In consequence, there is substantial reason to believe that defendants, unless enjoined, will continue to attempt to frustrate plaintiff's efforts to collect the judgment.[16] Accordingly, the application for a preliminary injunction turns in the main upon whether plaintiff has established a sufficient likelihood of success.

### 2.   *Likelihood of Success*

Plaintiff in substance claims that the Enterprises-to-International transfer was fraudulent on three theories: (1) constructive fraud, i.e., that Enterprises was insolvent at the time

---

[15]

See Wasson Decl. ¶ 21 & n.3; Shukat Decl. ¶¶ 9-12.

[16]

Tellingly, Chalpin has used shell companies in the past to avoid payment obligations. *See In re Boxley*, 218 A.D.2d 623, 623-624, 630 N.Y.S.2d 754, 755 (1st Dep't 1995) (finding that attorneys did not act improperly "in seeking a clarification of the retainer agreement when the clients proposed releasing certain performers under their management from their contracts, raising a possibility that the performers' royalties would thereby be placed outside the scope of the retainer agreement while leaving it open to appellant Chalpin to re-sign the released performers with shell entities he was known for using in the past"); *Gonzalez v. Chalpin*, 159 A.D.2d 553, 555, 552 N.Y.S.2d 419, 420 (2d Dep't 1990) (finding Chalpin individually liable for breach of contract, despite his "bald assertions" that he was acting on behalf of a partnership).

of, or rendered insolvent by, the transfer, and that the transfer was made without fair consideration;[17] (2) actual fraud, i.e., it was made with actual intent to hinder, delay, or defraud;[18] and (3) that Enterprises made the transfer without fair consideration when it was a defendant in an action for money damages or a judgment debtor and the judgment was not satisfied.[19]

      As defendants claim that Enterprises transferred the masters to International, plaintiff concededly will establish that a transfer occurred notwithstanding considerable reason to doubt that defendants are telling the truth.[20] The fundamental difficulty here is that there is substantially no competent evidence concerning the date, nature, or circumstances of the transfer. The record therefore is essentially silent also as to whether Enterprises was (a) insolvent at the time of, or rendered insolvent by, the transfer, or (b) a judgment debtor or a defendant in an action for money damages at the time of the transfer. There is a similar paucity of evidence as to the fairness of the consideration, if any, received by Enterprises. The lack of evidence, however, was entirely a product

---

[17]

      N.Y. DEBT. & CRED. L. § 273 (McKinney 2001).

[18]

      *Id.* § 276.

[19]

      *Id.* § 273-a.

[20]

      The evidence that the masters no longer are owned by Enterprises consists of (a) the auction catalog, which states that International is the seller, (b) Chalpin's assertion that Enterprises transferred them to International at some point, and (c) the unsigned bill of sale attached to defendants' lawyer's declaration. But the catalog is not persuasive, even if one were to put aside the fact that it is hearsay. There is no basis for concluding that the Auctioneer had any basis for saying that International was the seller, and therefore perhaps but not necessarily the owner, beyond whatever Chalpin may have told it. Chalpin's testimony does not inspire confidence, and the veracity of whatever he may have told the Auctioneer is at least equally subject to question. Thus, it is conceivable that there never was any transfer and that Enterprises, if it still exists, or the distributees on its dissolution, if it was dissolved, owns them. It is unnecessary, however, to decide this for purposes of this motion.

of Chalpin's evasiveness and lack of credibility as a witness[21] and the defendants' unjustified refusal to produce documents.

Chalpin's testimony was rather exceptional. One notable example is Chalpin's claim that Enterprises was "discontinued," "[a] few years ago. Two or three years ago."[22] This admission was important and adverse to the defendants because it indicated that the transfer postdated the commencement of the English litigation and, indeed, one or more of the subsequent judgments, a material fact under Section 273-a of the Debtor and Creditor Law. Apparently realizing this, Chalpin changed his story moments later. He said that Enterprises was wound down "many years back,"[23] thus closing off the possibility of a later transfer. But the assertion that Enterprises was dissolved "many years back" was belied by the facts, among others, that Enterprises (a) sued in 1999 to enforce rights in the *Public Enemy* master[24] and (b) entered into an agreement in 2000 pursuant to which it took an assignment from an English charity.[25]

Another example was Chalpin's testimony concerning the date of the transfer. He first testified that Enterprises transferred all of its assets to International, that he did not recall when it did

---

[21]
      The Court relies in part for this conclusion on its assessment of Chalpin's demeanor as well as other factors.

[22]
      Hearing Tr. 10.

[23]
      *Id.* 18.

[24]
      *Id.* 17-18 & PX 1.

[25]
      Hearing Tr. 33-36 & PX 3.

so, but that it was "many years back."[26] Moreover, Chalpin's lawyer on cross-examination showed

him the unsigned purported bill of sale, Chalpin claimed to recall that the transfer to International

occurred in 1972.[27] But this was inconsistent with Enterprises in 1973 having entered into the

English consent decree, which acknowledged Enterprises' ownership of the 33 masters, not to

mention the substantial evidence that it continued in business into 2000 and beyond.

Still another example was Chalpin's failure to give responsive answers to questions

as to the nature and extent of any consideration received by Enterprises in exchange for the transfer.[28]

He repeatedly professed lack of recollection.

Chalpin's professions of ignorance and lack of recollection are not persuasive. He

understood well in advance of the hearing that the principal matter in issue was whether the transfer

was fraudulent and that this depended upon its timing, the consideration received, and the financial

condition of Enterprises at the time of the transfer – all matters well within his ken and determinable

from records within his control. In the circumstances, the Court finds, subject to revision in light of

further evidence, that Chalpin deliberately and knowingly testified evasively in order to conceal the

truth.[29]

Nor did this stand alone. The defendants failed to produce patently relevant

documents in response to plaintiff's request. The excuse advanced was frivolous and not seriously

---

[26]

 *Id.* 13-14; *see id.* 16-17.

[27]

 *Id.* 39-40.

[28]

 *See* Hearing Tr. 22-23

[29]

 In doing so, the Court relies in part on Chalpin's demeanor.

held. The object was to avoid putting evidence into the hands of the plaintiff in time for the hearing in an effort to defeat plaintiff's motion.

A refusal in a civil case to answer questions, even based on the privilege against self incrimination, permits an inference that answers would have been contrary to the interests of the witness.[30] *A fortiori,* a similar inference is permissible where the trier of fact is convinced that the witness has given evasive or false testimony to avoid revealing the truth.[31] And a failure of a witness to deny an accusation in circumstances in which such a denial reasonably would be expected constitutes an adoptive admission.[32] Similarly, an adverse inference may be drawn in appropriate circumstances from a party's failure to produce evidence in breach of its discovery obligations.[33]

In all the circumstances, then, the Court infers that the unproduced documents and

---

[30]

See, e.g., *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (recognizing rule that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them").

[31]

Cf., e.g., *In re Weiss,* 703 F.2d 653, 662-64 (2d Cir. 1983) (holding that false or evasive testimony is tantamount to refusal to answer and is properly punished by contempt).

[32]

See, e.g., *Fletcher v. Weir*, 455 U.S. 603 (1982) (witness may be impeached by "previous failure to state a fact in circumstances in which that fact naturally would have been asserted," and permitting impeachment of criminal defendant with pre-*Miranda* silence); *United States v. Flecha*, 539 F.2d 874, 877 (2d Cir 1976) (silence is evidence of an admission when "there are circumstances which render it more reasonably probable that a man would answer the charge made against him than that he would not").

[33]

See Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 107 (2d Cir. 2002) ("Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to . . . proceed with a trial and give an adverse inference instruction."). Such an inference may be drawn where the party had an obligation to produce the evidence in a timely way, the party failed to do so with "a culpable state of mind," and the evidence is relevant to the party's claim or defense. *Id.* at 107.

truthful testimony by Chalpin would have supported plaintiff. With this established, the Court proceeds to consideration of plaintiff's actual fraud theory.

Section 276 of the New York Debtor and Creditor Law provides:

> "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

"The burden of providing 'actual intent' is on the party seeking to set aside the conveyance."[34] As direct proof of fraudulent intent seldom is available, it typically is proved inferentially "from the relationship among the parties to the transaction and the secrecy of the sale, or from the inadequacy of consideration and hasty unusual transactions."[35]

In this case, the transfer, which was secret, was between related parties. According to Chalpin, Enterprises and International were family companies. While he was unable or unwilling (the Court finds the latter) to provide any detail, it is plain enough that both are or were entirely controlled by Chalpin, his wife, and a brother.[36] As defendants are in exclusive possession of the facts concerning the consideration, if any, paid by International, the Court infers and therefore finds for present purposes that the transfer was not for fair consideration. And while this is more than sufficient to find that plaintiff is likely to prevail on the actual fraud theory, Chalpin's behavior is icing on the cake, as his failure to explain the transfer strengthens the Court's finding that the plaintiff is likely to prevail on its actual fraud theory. Accordingly, it is unnecessary to consider the

---

[34]

*United States v. McCombs,* 30 F.3d 310, 328 (2d Cir. 1994).

[35]

*Id.* (quoting *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1041 (2d Cir. 1984)).

[36]

Hearing Tr. 21, 36-37.

alternative theories.

B.      *Order of Attachment*

     1.      *Attachment Under New York Law*

     The Second Circuit recently summarized the principles governing attachment in New York federal courts as follows:

> "Attachment is available in a federal court, subject to qualifications not applicable here, 'under the circumstances and in the manner provided by the law of the state in which the district court is held.' FED. R. CIV. P. 64; *accord Cargill, Inc. v. Sabine Trading & Shipping Co., Inc.,* 756 F.2d 224, 227 (2d Cir. 1985). The grounds for attachment in New York are set out in Section 6201 of the New York Civil Practice Law and Rules:
>
>> '[a]n order of attachment may be granted in any action, except a matrimonial action, where the plaintiff has demanded and would be entitled . . . to a money judgment against one or more defendants, when:
>>
>> '(1) the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state; or
>>
>> '(2) the defendant resides or is domiciled in the state and cannot be personally served despite diligent efforts to do so; or
>>
>> '(3) the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts; or
>>
>> '(4) the action is brought by the victim or the representative of the victim of a crime, as defined in subdivision six of section six hundred twenty-one of the executive law, against the person or the legal representative or assignee of the person convicted of committing such crime and seeks to recover damages sustained as a result of such crime pursuant to section six hundred thirty-two-a of the executive law; or
>>
>> '(5) the cause of action is based on a judgment, decree or order of a court of the United States or of any other court which is entitled to full faith and credit

in this state, or on a judgment which qualifies for recognition under the provisions of article 53.' N.Y. CPLR § 6201 (McKinney 1980).

"More, however, is required than the existence of a statutory ground for attachment. A plaintiff seeking an order of attachment must show 'that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in Section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff.' N.Y. CPLR § 6212 (McKinney 1980)."[37]

2.      *Analysis*

Putting to one side the breach of contract claim of Count I, the crux of the complaint is that Chalpin, who is a judgment debtor of the plaintiff, caused the fraudulent transfer of valuable assets by Enterprises, also a judgment debtor, to another Chalpin-controlled entity, International, for the purpose and with the effect of hindering plaintiff's ability to collect its judgment. While much of the complaint seeks equitable relief, it seeks damages against all defendants on Counts X through XII. The claim therefore falls within both subdivisions 3 and 5 of CPLR Section 6201. Moreover, there has been no suggestion that any of the defendants has any counterclaim against plaintiff. "[T]he amount demanded from the defendant [therefore] exceeds all counterclaims known to the plaintiff." As plaintiff is likely to prevail on the merits, it is entitled to an order of attachment.

*Conclusion*

Plaintiff's motion for a preliminary injunction and an order of attachment is granted in both respects. The temporary restraining order previously entered is converted into a preliminary

---

[37]      *Capital Ventures, Inc. v. Republic of Argentina,* No., 05-2591, slip op. at 7-9 (2d Cir. Mar. 23, 2006).

16

injunction, which shall remain in effect until the determination of this action. As the terms of the restraining order may be broader than necessary, the parties are encouraged to agree upon revised terms. Failing such agreement, defendants may move to modify them on five business days' notice. Plaintiff shall settle an order of attachment on two days' notice.

The foregoing constitute the Court findings of fact and conclusions of law.

SO ORDERED.

Dated:          November 6, 2006
Issued at:

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)